[Civ. No. 14989.   Second Dist., Div. Two.   Feb. 19, 1946.]

WALTER B. ROSELIP et al., Respondents, v. A. J. RAISCH, Appellant.

Cooley, Crowley & Supple and Courtney L. Moore for Appellant.

Nelson & Castro and A. V. Muller for Respondents.

MOORE, P. J.—Respondent Roselip was the owner of a sand and gravel pit and asphalt plant at Atascadero. After trial he was awarded damages for its negligent destruction by fire during appellant's occupancy. On this appeal we are to determine (1) whether the negligence was that of appellant or of respondent and (2) whether the allowance of rentals for the plant prior to its reconstruction is authorized by law.

Appellant held a contract with the state to build a 30-mile highway near Camp Roberts and was in need of facilities to supplement his own mixing plant which he proposed to erect on the premises of respondent. On July 28, 1942, by writing, appellant purchased from respondent certain min-

eral aggregates, screenings and sand and rented a portion of respondent's asphalt plant. No question as to the rentals or the payments for mineral aggregates or sand is involved in this appeal, hence no further mention thereof. Pursuant to the written contract respondent rented to appellant a satisfactory site for the latter's own plant and sufficient land for the storage of materials, together with free access to the public highway, which privileges appellant exercised and enjoyed during the period of his occupancy. Respondent's plant was to be restored to its original condition, reasonable wear and tear excepted.

## THE FINDINGS.

Contemporaneously with the execution of the written contract and delivery of possession to appellant the parties orally agreed that during the occupancy Raisch would make plant-mix for Roselip's use in local construction at 70 cents per ton and appellant agreed to pay respondent as compensation for use of the plant in making the plant-mix three cents per ton: the oil, rock and sand to be supplied by respondent at the plant. But that portion of the judgment awarded for making the last mentioned plant-mix is not involved in this appeal. After defendant had finished construction of the state highway, but while he was still in possession, the asphalt plant by reason of his negligence was destroyed by fire.

Following the fire the corporate plaintiffs paid Roselip* the amounts due him under their insurance policies and were subrogated to his claims against appellant for his negligence in causing the fire. They joined in this action to recover the sums paid while respondent sued for the rental value of his plant during the period prior to its reconstruction. The court found the above recited facts and determined that appellant was indebted by reason of his negligence in causing the fire in the sum of $8,470.74 and for loss of rentals in the sum of $4,617.60.

It was also found that on August 16, 1942, appellant took possession of respondent's property in good condition and repair. He arranged and paid for such power and water as was required, made extensive modifications of the plant, replaced the wood-heating unit with an oil burner, installed

---

*Inasmuch as the corporate plaintiffs are not involved in the issues of this appeal the term respondent will refer to Roselip only.

a fuel-oil line to the burner and supplied the fuel oil. The burner was of the variety customarily used for a firebox. It was regulated by pet cocks, and steam from the nearby boiler was used to force the oil to the burner. The fuel-oil tank was a cylindrical, metal receptacle with a manhole 15 inches in diameter in its upper side and was set on a brick foundation. It was fed from a tank alongside of it, elevated "on stilts," which was in turn fed from a larger tank on a slight elevation some 60 feet away. The smoke from the burner was conducted upward through a flue. If while the burner was operating an obstruction had been placed on top of the chimney, it would cause the fire to shoot backwards. A possible cause of the subsequent conflagration appears to have been the excessive heat generated by the oil burner under the fuel-oil tank. The purpose of heating such tank was to facilitate the flow of the fuel oil, not to cause it to boil. But if excessive fuel oil was forced by the steam into the burner it would force the flames to the rear end of the furnace and up the flue and to the outside.

On November 2, 1942, having completed his 30-mile highway construction, appellant left his equipment and maintenance men at the asphalt plant and went to Hamilton Field to complete unfinished work there with the understanding that he would return in about a week to produce the plant-mix required by respondent for his unfilled orders. He returned on November 30 to fulfill his promise and to put the plant in its former condition. Shortly after the commencement of operations on the following day the heating unit ignited and the flames which spread from the furnace destroyed the asphalt plant and adjoining property and movables of respondent. The plant was not placed in repair until March 21, 1943. Respondent was awarded damages for the loss of his property and for its rental value prior to its reconstruction.

### CONTENTS OF APPELLANT.

Appellant contends that the evidence does not support the findings: (1) That the defective conditions of the plant were due to appellant's lack of ordinary care during his occupancy and hence the doctrine of res ipsa loquitur is not applicable; and (2) that the loss of rental value was due to appellant's own failure promptly to replace the plant. He argues that he had restored possession of the plant on Novem-

ber 2 to respondent who thereafter was in control of it; that the oil was ignited by reason of the negligence of respondent who had originally constructed the plant; that the receiving tank on top of the hill was "not a closed container, but had a peaked roof which was open at both ends"; that during appellant's absence a severe rainstorm on November 17 and 18 resulted in the entry of a generous supply of water into the metal cylinder containing the oil; that the water, having taken its place at the bottom of the cylinder, by reason of the application of excessive heat, boiled, causing the oil to foam out; that the vapors from the heated oil ignited, which in turn set aflame the foaming oil.

With reference to the damages resulting from delays in the reconstruction of the plant, appellant contends that "if Roselip had been willing to sign the reservation of rights agreement both his and Raisch's plant could have been put back in operation within a week"; that respondent is not entitled to the rental value of the plant until March 21, 1943, because he did not exercise diligence to avoid loss or to minimize the resulting damage, and that the rental value allowed was not proved.

## WAS APPELLANT NEGLIGENT?

In order to determine which party was negligent we have first to ascertain whether appellant's occupancy was continuous as found by the trial court after November 2, and if so then whether any act or omission of respondent relieved appellant of his duty to protect the asphalt plant against the hazards of fire and explosion. Notwithstanding the contentions of appellant that on his departure from the leased premises respondent reentered and occupied the property and neglected so to care for the fuel-oil tank as to permit rain to fall therein, the facts in evidence justify the finding that appellant's possession was intended by him to continue until he withdrew his own possessions and restored respondent's plant in good order and repair. The modifications of respondent's plant as shown by his testimony clearly indicate the conclusion derived by the court below. Such changes were evidently made for the purpose of enabling appellant to enjoy the benefit of the maximum productive capacity of the plant and of enhancing the efficiency of his own machinery there installed. The hopper was placed 60 feet away from its former position; conveyor

belt No. 9 was cut and left lying on the ground; conveyor belt No. 17 was cut and used to run rock material off at a different point; the electric motor was placed on the steel tank near road No. 1 for transferring the asphalt oil to appellant's asphalt plant; the chain and transmission assembly was dismantled and removed from its place on the bunkers; the conveyor frame No. 9 was taken apart and laid on the ground; the electric wiring and lighting systems were taken apart; the pipelines from the boiler were changed to run to appellant's plant; the bunkers on top were reconstructed; bulkheads on the southwest side were built and a bumper was framed there for trucks in order to load directly into the bunkers instead of using a bulldozer as respondent had done; an additional fuel tank was installed on the hill; the power was disconnected at the switch, transferring it to appellant's switch panel and the lighting system was changed in order to get his own lights off the same power he had for his plant; the oil lines were disconnected from the concrete tank and all of the oil lines were changed to match appellant's set-up. Giannini, appellant's engineer, testified that he removed the firebox in which respondent had burned wood and installed and used an oil burner. Appellant notched and weakened timbers supporting the bunkers in order to enable him to install timbers to hold up his feeders.

Besides the changes made there is other evidence indicating that appellant intended only a brief absence when he left on November 2. Roselip testified that in a conversation between Roselip and Stanley, superintendent of appellant, before the withdrawal on November 2, Stanley said that they were then hurriedly leaving the plant to finish work in Marin county which would require about a week but were returning soon to run 2,600 tons of plant-mix required for respondent and would then remove appellant's plant. He told Gibson on November 29 that he was ready to run the plant-mix for respondent and Gibson replied that appellant would return, produce the hot-mix and then remove his own equipment. Before Stanley finally left he instructed respondent to have asphalt in the concrete tank that loss of time might be avoided at the commencement of the final run. Also, on November 2 appellant left a crawler-type crane, a shovel with a boom on it and two trucks and his tools without asking the consent of respondent. Thereafter appellant's employees who remained entered the asphalt plant. They

were engaged in hauling sand from the stock pile and appellant's equipment was stored in and around the asphalt plant. Such employees passed through respondent's plant area to get drinking water. The trucks of appellant left behind on November 2 were stored north of the boiler at the asphalt plant. Appellant had a crew of several men around the plant until November 14 when the 30-mile strip was completed. In addition to these facts, according to Mr. Gibson, from and after November 2, appellant kept certain maintenance men on his payroll and two of them were on respondent's premises at all times painting appellant's dryer and cyclon. Also, appellant maintained his headquarters in Atascadero until about November 25.

Nothing appears in the evidence to indicate that respondent took any step to repossess the plant after November 2. On the contrary, the interest displayed by Stanley in furnishing asphalt hot-mix in the area surrounding Atascadero further indicates that the purpose of appellant was to continue his operations for some time after the temporary sojourn of the main portion of appellant's crew in Marin county. The trial court was not obliged to be governed in deriving its findings by the fact that respondent had repossessed the plant after November 2 merely because he appeared at his office on the premises. The occupancy of his office was an essential part of his rock and sand business which had continued during appellant's actual occupancy of the plant after August 16. Neither did respondent's employment of his watchman indicate a resumption of possession. All of respondent's employees who entered the premises prior to the fire were there to assist respondent in the operation of his rock plant only. It thus appears that the asphalt plant of respondent was at all times in November and on the day of the fire under the dominion of appellant. On the other hand, there is no evidence that respondent exercised any control thereof or that he owed any obligation arising out of the final run of hot-mix except to pay appellant the price agreed upon July 28. It thus appears that the finding of appellant's continuous possession and consequent liability for the fire is supported by substantial evidence. Hence it cannot be disturbed on appeal. (*Olivero* v. *Rosano,* 42 Cal. App.2d 740, 743 [109 P.2d 976]; *Fischer* v. *Keen,* 43 Cal. App.2d 244, 288 [110 P.2d 693].)

### Respondent Was Not Bailee of His Plant After November 2.

Appellant's theory that respondent is responsible for the condition of the fuel oil subsequent to November 2 because under the evidence respondent at least became bailee of the plant even though appellant held it under his leasehold is not supported. The record is destitute of proof that Roselip consented to a bailment of the property. The court was not obliged to find that respondent's failure to protest the temporary absence of appellant from Atascadero was conclusive proof of his agreement then to occupy the plant. No consideration was paid by appellant for respondent to hold the premises or for the use of the plant after November 2.

If it were conceded that respondent became a bailee of appellant's interest in the property, he would have been merely a gratuitous bailee and would be liable for only gross negligence during his possession (4 Cal.Jur. 21), and not at all if the loss occurred without his fault (*Wolfe* v. *Willard H. George, Inc.*, 110 Cal.App. 532 [294 P. 436]). Also, if it be conceded that Roselip was bailee in November prior to appellant's return, surely the bailment would have terminated on appellant's reentry and resumption of operations.

The simple fact found by the court and proved by the evidence is that Raisch announced his plan to be absent from the plant at Atascadero while completing the Marin contract. From this the inference was not unreasonable that appellant did not purpose to surrender his lease pending his absence. Respondent never said that he would operate it or disturb the arrangements of any part of the equipment as established by Raisch. He did not operate the plant even though on November 2 he was obligated to deliver asphalt mix to the city of San Luis Obispo and to the county as well.

### Therefore Appellant Was Liable.

It follows that appellant was chargeable as occupant and operator of the hot-mix plant on December 1. He as such operator knew the plant was so geared as to use fuel oil as fuel; that such oil had been purchased for his own operations; that it was charged with readily inflammable gases; that such gases would pass off under the influence of heat; that water is often contained in fuel oil; that such water rests at the bottom of a tank; that upon its boiling under such heat the water drives upward, causes the oil

to bubble over and to dissolve into its gaseous constituents which in turn will be ignited by a flame. It was appellant's duty to have an engineer of such experience in charge of the plant on December 1 as would not only know the perils of heating fuel oil but would exercise such care as to test for the presence of water. This he could have done either by use of the bleeder on the pipeline of the fuel oil theretofore used by respondent or by extending the fuel-oil pipes to the bottom of the fuel-oil tank, thereby first removing the water. The results of applying heat to the fuel-oil tank had been observed by appellant's fireman, the witness Ledbetter, in the spring of the year. Negligence in the application of excessive heat to the fuel-oil tank was certain to cause such overflow of the oil. If the fire under the fuel tank was sufficiently intense to send flames up the flue and an obstruction was placed on the top thereof, it would impede the upward direction of the flames and spread them in all directions; and if the oil was fed in such abundance and with sufficient force, its flame would contact the gaseous vapors from the oil. The oil was caused to bubble over by the application of heat on December 1; gases from the oil filled the area surrounding the firebox; the oil gushed from the hole in the top of the fuel tank; the pressure of the fuel oil in the firebox caused the flames to shoot from the chimney and out of the firebox to ignite the fuel oil whose flames instantly spread to the top of the fuel tank. There was yet another course the flames might have taken. The fuel oil could have reached and ignited the 18,000-gallon tank of asphalt. Whatever might have been the precise origin of the flames, it is clear that the trial court was warranted in finding under the charge of general negligence that appellant was liable.

### The Doctrine of Res Ipsa Loquitur.

The principles of this doctrine are invoked by respondent as applicable to the facts of this case. They are clearly and forcefully announced in many California decisions. Where one relies upon the doctrine to establish liability of the defendant he must allege merely general acts of negligence. But plaintiff is not deprived of the benefit of the doctrine merely because of proof "which does not clearly establish the facts or leaves the matter doubtful."

The doctrine is applicable where plaintiff's pleading or evidence leaves the cause of the injury in doubt so long

as the destructive or injurious instrumentality was under the exclusive control of the defendant and the injury was one which in the natural course of things would not have occurred had the defendant used due care. (*Keller* v. *Pacific Telegraph & Telephone Co.*, 2 Cal.App.2d 513 [38 P.2d 182]; *Carlsen* v. *Diehl*, 57 Cal.App. 731 [208 P. 150]; *Jorgensen* v. *East Bay Transit Co.*, 46 Cal.App.2d 189 [115 P.2d 556]; 45 C.J. 1206; *Chauvin* v. *Krupin*, 4 Cal.App.2d 322 [40 P.2d 904].)

■ No person in charge of a dangerous instrumentality can avoid his liability for an injury resulting from its mismanagement because out of a number of probable causes of the injury he may have concluded, and procured witnesses to testify, that the injury was due to cause A and not to cause B. That such instrumentality was under his control at the time of its destructive behavior establishes the liability of the operator in the absence of proof of successful interference by another. Respondent did not allege a specific act of negligence as the cause of the fire. Neither did he attempt to prove a specific cause. His allegation was that "through the carelessness and negligence of defendant and through his, defendant's, lack of ordinary care," defendant set fire to respondent's property. And at the trial respondent had no witness who observed the origin of the fire. In his brief appellant admits that "no possible inference could be drawn, either logically or scientifically, from the gushing oil, tending to prove that the fire originated by reason of the fact that the oil burner was shooting flames out of the chimney. . . ." But if the fire in the burner was so forceful as to drive the flames out at the top of the flue; if the flames were there so spread as to reach the light ends afloat in the air around the flue; if the fuel oil was caused to bubble over by reason of its water content and by the application of excessive heat to the fuel-oil tank, then under the general charge of negligence judgment against appellant was justified under the res ipsa doctrine.

■ Moreover, in using a dangerous instrumentality the amount of care of the user increases in proportion to the danger, and whether he should have anticipated injury depends upon the facts that beset him. (19 Cal.Jur. 563.)

■ Appellant was on December 1 using equipment which he had himself installed to heat the fuel. The combination of

heat, inflammable oil and steam under pressure was sufficient to arouse the brain centers of caution in an experienced fireman. Such facts required appellant in the exercise of ordinary care to know of the attendant dangers and to avoid them. ■ The finding of appellant's negligence in view of the events is justified by the doctrine that it is the duty of the reviewing court to sustain all reasonable inferences of the court below. (*Patten & Davies Lumber Co.* v. *McConville,* 219 Cal. 161 [25 P.2d 429].) And when two or more inferences can be reasonably deduced from the facts the appellate tribunal "is without power to substitute its deductions for those of the jury." (*Fischer* v. *Keen,* 43 Cal. App.2d 244, 248 [110 P.2d 693].) That appellant installed the burner with which to heat the fuel oil is admitted. That he agreed to supply respondent with such hot-mix as he might require is not denied. Even the last attempt to run on December 1 was for the purpose of supplying respondent's local demands. No fuel oil was purchased by respondent prior to the day of the fire. It was appellant's oil. He maintained possession under lease until he should remove his own equipment and dismantle and reorganize the plant of respondent. His own crew was in control and was actively operating at the time of the fire. His engineer knew or should have known that the fuel oil contained water; that water when mixed with oil and subjected to excessive heat is a dangerous element; and that there should have been a "bleeder" in the "lowest part of the tank" so that the water accumulated "from the crude oil or from leaky roofs and rainfall" could be drained off. According to the testimony of the witness Todd, manager of the Union Oil Company at San Luis Obispo, such has been the approved practice for forty years in determining the presence of water in oil, and it is a fact that such a bleeder had been used by respondent prior to appellant's occupancy. It was therefore negligence of the fireman not to have first ascertained the presence of water in the oil.

When the flames shot from the top of the flue on the firebox, unobstructed, they might have escaped without tragedy. But in violation of fundamental principles of physics appellant's employees held a flat object over the top of the chimney. When the flames were thus spread destruction of the plant was inevitable.

Was Judgment for Loss of Rental Value Justified?

After the court had correctly determined appellant's liability for the destruction of respondent's asphalt plant it was confronted with the latter's demand for damages on account of the loss of its rental value during the period of reconstruction. There is no evidence to warrant the finding that the plant had a rental value of $44.40 per day. The proof of rental value was that such a plant is customarily leased on a tonnage-run basis. The very contract of July 28 leased this plant to appellant "in consideration of a rental rate of three cents per ton on the quantity of mineral aggregate purchased by the buyer." Not only is there no proof of such daily rental value of the plant as $44.40 but the only proof of respondent's operations for others is that during four months in 1942 he sold 6,588 tons, which at the rate of 15 cents a ton, would give a rental value of $8.25 per day. Neither is there satisfactory proof that 104 days was a reasonable time for its reconstruction.

Respondent claims loss of the use of his plant for such period. There is no satisfactory explanation of his delay in commencing his operations to about January 10, 1943. Moreover, in the 64 days during which the reconstruction actually proceeded there were nine Sundays, two holidays and 11 nonworking days, leaving only 42 actual working days during the reconstruction. At $8.25 per day respondent could by leasing his plant have earned only $346.50. Besides this vice in the court's finding as to rental losses there is no proof of certainty of rentals during the shut-down period. Even though the government might have actually employed respondent to deliver the hot-mix for a particular construction, the army agents might have negotiated a different deal and the possible trade of the public might have gone to other asphalt plants. All of the "definite orders" for hot-mix asserted to have been held by respondent on December 1, the "back log," the "promises" of patronage—these were not proper bases for assessing damages for loss of rentals of the plant. "Prospective" work to be done at the airport or in San Luis Obispo, or by the county or by any of its municipalities was only speculative until signed contracts for hot-mix reposed in the locker of respondent, and did not justify a finding of losses of daily rental value.

There being neither proof of a daily rental value of $44.40 or of any other sum, nor satisfactory evidence of the cer-

tainty of a continuous flow of business during 104 days of the plant's silence it must be held that recovery in the sum of $4,617.60 for loss of rentals was not justified.

### DUTY TO MITIGATE DAMAGES.

There is no satisfactory evidence that respondent exercised reasonable diligence in rebuilding his plant. There is some competent and undisputed evidence that it could have been erected within a week and that with the assistance of army officers materials and equipment could have been immediately procured. In order to expedite the reconstruction a contract was drafted on December 8 at the request of appellant whereby the plant's construction might proceed, with the provision that the rights of both parties were preserved as to a final determination of liability for the losses suffered in the fire. In declining to subscribe to the proposed contract and thus to cooperate with appellant, respondent not only delayed the reconstruction but lost the opportunity to fill army orders. ▇ It was respondent's duty to take such reasonable steps as would avoid, or minimize, his own losses by any reasonable exertion without serious expense to himself. (15 Am.Jur. 422, 425; 17 C.J. 767, 776-778; 8 Cal.Jur. 782.) ▇ Respondent contends that it would have been futile for him to sign the proposed reservation of rights agreement in the absence of a contract between the Army, a construction company and both litigants for the rebuilding of the plant. But such argument begs the question. An agreement to defer a decision as to which was liable for the fire could in no event have impaired the rights of respondent, as "the law's delays" in this action have demonstrated. The serious attempts of the United States Engineer's office in acting for the Army to obtain materials essential to the plant's reconstruction must be credited with a soupçon of sincerity under the circumstances confronting the republic on December 8, 1942, when every available, useful facility had been requisitioned to meet the most distressing national emergency in our history.

In view of the foregoing the judgment is modified by deducting therefrom the sum of $4,617.60, and as so modified it is affirmed.

McComb, J., and Wilson, J., concurred.