[Civ. No. 10472. Third Dist. Jan. 14, 1963.]

ALHAMBRA BOWL, INC., Plaintiff and Respondent, v. LEDBETTER SIGN COMPANY, Defendant and Appellant.

Franklin H. Roberts, Jr., for Defendant and Appellant.

Cooley, Crowley, Gaither, Godward, Castro & Huddleson and Thomas A. H. Hartwell for Plaintiff and Respondent.

VAN DYKE, J.*—This appeal is taken from a judgment rendered in favor of plaintiff in an action brought to recover damage to a building in Sacramento caused by fire. The only issue presented on appeal is as to the sufficiency of the evidence to sustain the judgment.

The building housed a series of bowling alleys. Offset against the front or western face of the building was a vertical sign pylon, holding on either side neon-lighted lettering spelling the word "Bowling." The pylon ran from slightly below the level of the second floor of the building upward to a point a little above the outer wall of a third story penthouse atop the main structure. The pylon was

*Retired Presiding Justice of the District Court of Appeal sitting pro tempore under assignment by the Chairman of the Judicial Council.

hollow so as to permit workmen to work inside on the wiring to the lettering which was served by four transformers inside the pylon, each transformer furnishing energy to a part of the sign. These transformers converted the 110-115 volt house current to 12,000-15,000 volts of low amperage. Access to the interior of the pylon at its lower end was gained through a grilled panel located inside the west or front wall of the second story. Throughout the period involved appellant was under contract with the building owners to service and maintain the neon sign in good working order. A fire occurred in the building on August 4, 1958. About a month previously respondent began its annual cleanup of the premises, and to permit painting the front of the building appellant removed the neon lettering forming the sign. When the painting was completed, which was done about the end of the first week of July, appellant was contacted and asked to reinstall the lettering and put the sign in condition to operate. Responsive to this request, appellant sent its workmen to the premises. They entered the pylon through the panel and worked on the sign for some time, after which they notified respondent that the sign was in working order and could be turned on. That evening respondent's night porter turned on the switch to activate the sign, went outside and noted that the sign was properly lighted, and left. He placed the time at which he did this as between 8:15 and 8:45 p.m.

Shortly before 9 o'clock a battalion fire chief patrolling the area discovered that the neon sign was smoking. He turned in a fire alarm at 9:04 p.m., and then went to the building to await the response of firemen. A witness who worked across the street from the building observed that the sign had been lighted and then, a little later, saw that the lettering was going out, at which time the witness noticed smoke coming out of the pylon near the lower letters of the sign. When the firemen arrived, smoke was observed pouring out of a grill above the front door and beneath the sign. The firemen went up to the room on the second floor which contained the entry panel to the pylon. Under the instructions of the chief they "axed out" the panel and smoke and flames poured into the room. The chief testified that when he entered the second floor with his men, he went to the panel and noticed flames behind the openings in the grill work; that when the panel was removed he saw the flames come out into the room; that at that time the whole area inside the pylon was involved

and the pylon was acting as a sort of chimney; that the fire had by that time spread to the floors above. After the fire was extinguished, the chief, in his report, fixed the point of origin of the fire to be within the frame holding the neon sign and at the point where the appellant's employees had been working. He also at the trial testified that such was the point of origin, that the fire "couldn't have started anywhere else;" that "[w]hen I arrived on the scene, that particular sign itself was smoking, so it had to have started in that area there." A general contractor who repaired the building after the fire testified that the burn on the second floor came back through from the pylon to where it hit the truss and the ceiling line and then it burned up to the top of the truss. (The truss referred to was a supporting truss of the arch type, located some distance back from the western wall of the building, the bow of the arch extending from the ends of the truss which rested on supports about the level of the first floor ceiling and rising from either end to about the level of the second floor ceiling. The arch was supported by webbing inside the truss and the truss was covered on either side with diagonal sheathing.) There was evidence the sign's going out indicated malfunction of the wiring; that if this malfunction had been in the house current leads going to the transformers the fuse would probably have blown, which would have stopped the flow of current to the transformers; that since this had not happened the malfunction was in the secondary wiring system. There was testimony that it was possible the high voltage within the secondary wiring system would under favorable conditions cause arcing, that is, cause the current to leap across an air space from one lead to another, or from a lead to ground, and that if this occurred fire might result if the arcing was sufficient, as it might be, to cause ignition of flammable material exposed to it.

The evidence was sufficient to sustain the judgment. The fire chief was qualified as an expert witness by reason of his long experience with fires in the course of his duties as a fireman. He based his opinion as to the point at which the fire started upon his observations and his experience. His testimony, coupled with the other testimony we have related, was sufficient to sustain the implied finding of the trial court that the fire started in the area where the appellant's workmen had been and, consequently, that it was through their negligence that the wiring system was left in

such a condition that when the current was turned on, fire in the pylon resulted. ██ Appellant was authorized, through its contract, to service the sign, and obligated to do so. Its workmen had been in sole control of the area in which the wiring system was located. If, as the court could find from the evidence, no one else had gained access to the area, then, in the servicing of the wiring system, it was reasonable to infer that any negligence had been that of the appellant's workmen. Fires do not normally occur from electric wiring that is properly installed and maintained. (*Roselip* v. *Raisch,* 73 Cal.App.2d 125 [166 P.2d 340] ; *Phillips* v. *Southern Cal. Edison Co.,* 23 Cal.App.2d 222 [72 P.2d 769] ; *Escola* v. *Coca Cola Bottling Co.,* 24 Cal.2d 453 [150 P.2d 436].)

██ Appellant argues that its expert, a Mr. Blewett, gave testimony to such effect that it must be considered as having dispelled any permissible inference of negligence on the part of appellant's workmen. Appellant argues that the trial judge could not disregard uncontroverted, uncontradicted and not inherently improbable testimony of the expert witness as to the point of origin of the fire. Of course, if the fire originated outside the pylon and away from the area under control of the appellant's workmen, then there would be no basis for fixing liability for the fire upon the appellant, but we do not think that the testimony of the expert produced by appellant can be considered as uncontroverted and uncontradicted. On the contrary, as we have said, we think the testimony, other than that of the expert, as to the point of origin of the fire was sufficient to uphold the court's implied finding that the origin was at the point fixed by those witnesses. The testimony of the expert witness of appellant, who investigated long after the fire damage had been repaired, was to the effect that, in his opinion, the fire pattern as testified to by some of respondent's witnesses forced the conclusion the fire did not originate in that area of the building where the neon installations were; that the electrical system serviced by appellant could not generate sufficient heat to ignite a fire; that if there had been a defect in the primary side of the system before the current entered the transformers, this would probably have caused the blowing of a fuse which would cut off the power; that if there had been a defect in the secondary or high voltage side of the circuit, then even a direct short over a period of hours would not

generate sufficient heat to ignite flammable materials because of the low amperage; that whatever problem may have developed after appellant's workmen left, it was not present when they declared the sign to be ready to operate, for otherwise the sign would not have properly illuminated when switched on. Appellant concludes that since some of these matters were not directly disputed, there was no room for the inference that the fire started because of the negligence of the appellant. Appellant quotes from *Krause* v. *Apodaca*, 186 Cal.App.2d 413 [9 Cal.Rptr. 10], where the court said:

". . . There is no testimony as to the cause of the conflagration except that of the two experts, and no circumstantial proof except that which corroborates their opinions. The record suggests no reasonable explanation of the fire except that expressed by these experts. No question is raised as to their qualifications or their probity. Respondent merely argues that the trial judge was free to reject their testimony. Not so."

We think the situation argued for by appellant did not exist at the close of testimony in this case and we have already stated our reasons for so holding. The testimony of Mr. Blewett as to the point of origin and as to the other matters he testified to does no more than raise a conflict with respondent's evidence.

For the reasons given, the judgment appealed from is affirmed.

Pierce, P. J., and Schottky, J., concurred.