354 F.3d 1110
 UNITED STATES of America, Plaintiff-Appellant,
Eytan Mayzel, Claimant-Appellee,
v.
$100,348.00 IN U.S. CURRENCY, Defendant.
United States of America, Plaintiff-Appellee,
Eytan Mayzel, Claimant-Appellant,
v.
$100,348.00 in U.S. Currency, Defendant.
United States of America, Plaintiff-Appellee,
Eric Amiel, Claimant-Appellant,
v.
$100,348.00 in U.S. Currency, Defendant.
 No. 02-55330.
 No. 02-55363.
 No. 02-55364.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 3, 2003.
 Filed January 16, 2004.
 
 COPYRIGHT MATERIAL OMITTED John S. Gordon, Assistant United States Attorney, and Janet C. Hudson, Assistant United States Attorney, Los Angeles, CA, for the plaintiff-appellant-cross-appellee.
 Eric Honig, Marina del Rey, CA, for claimant-appellee-cross-appellant Eytan Mayzel.
 Elizabeth N. Rafeedie, Malibu, CA, for claimant-appellee-cross-appellant Eric Amiel.
 Appeal from the United States District Court for the Central District of California, Ronald S.W. Lew, District Judge, Presiding. D.C. No. CV-00-08921-RSWL.
 Before: D.W. NELSON, WARDLAW and FISHER, Circuit Judges.
 WARDLAW, J., authored the opinion of the Court as to Parts I, II, III, IV, V, VII and VIII in which D.W. NELSON, J., and FISHER, J., join. FISHER, J., authored the opinion of the Court as to Part VI, in which D.W. NELSON, J., joins.
 WARDLAW, J., filed a dissenting opinion as to Part VI.
 WARDLAW, Circuit Judge, with whom D.W. NELSON, J., and FISHER, J., Circuit Judges, join:
 
 
 1
 These consolidated appeals from the district court's forfeiture order present the novel question whether the "lawful possessor" of seized currency who has Article III standing to contest the seizure in a civil forfeiture proceeding is the proper party to make an Eighth Amendment Excessive Fines challenge to the amount forfeited. The majority of the panel answers this question in the affirmative. Each of the parties asserts other challenges to the district court's order. Eytan Mayzel, the "lawful possessor," argues that the district court erred by: (1) employing the incorrect standard of proof due to the enactment of the Civil Asset Forfeiture Reform Act of 2000; (2) granting summary judgment against him on all issues except the Eighth Amendment claim; (3) ordering even partial forfeiture of the seized funds as a violation of the Excessive Fines Clause; and (4) denying his request for attorney's fees under the Equal Access to Justice Act. Eric Amiel, an individual who asserted ownership of the seized funds more than nine months past the deadline, argues that the district court abused its discretion in striking his untimely and unverified claim. The government, in turn, asserts that the district court should have ordered forfeiture of the seized funds in their entirety.
 
 
 2
 For the reasons we explain below, we hold that the district court employed the correct standard of proof, appropriately granted summary judgment, properly denied attorney's fees, and did not abuse its discretion in denying Amiel's untimely, unverified claim for the funds. The majority further holds that the forfeited amount was not constitutionally excessive. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court's order.
 
 I. Background
 
 3
 On February 29, 2000, Eytan Mayzel, a 25-year-old Israeli citizen, was about to board a Virgin Atlantic flight from Los Angeles International Airport to London, England when he was stopped by United States Customs Service Senior Inspector Roberto Uscanga, who identified himself as a government official. Inspector Uscanga explained to Mayzel that federal law requires persons transporting any amount exceeding $10,000 out of the United States to declare the currency by completing a form. Mayzel responded that he was in the United States to visit family and friends, and was carrying only $5,000. He then handed Inspector Uscanga a bundle of cash which was later determined to amount to $348. Inspector Uscanga noticed a bulge under Mayzel's jacket, which Mayzel removed at his request, revealing a blue shoulder bag. Mayzel handed the bag to Inspector Uscanga, who found inside what was later determined to be $100,000 in cash sealed in ten clear plastic zipper bags. Even before counting the money, Inspector Uscanga was able to ascertain that the sum exceeded the reporting limit. Accordingly, he handed Mayzel Customs Form CF-503, printed in English, and requested that Mayzel complete it in compliance with the reporting requirement. Mayzel refused to do so, informing Inspector Uscanga (in English) that he wished to speak with his attorney, that he was not obligated to complete the form, and that he did not speak English.[1]
 
 
 4
 At this point, Mayzel was detained for questioning. The luggage for which he possessed baggage claim tickets[2] was removed from the plane and searched. The search revealed a roll of plastic shrink film, a heat gun, and a heat sealer machine: items often used in the packaging of illegal drugs. Mayzel refused to speak with the Customs investigators thereafter, invoking his Miranda rights.
 
 
 5
 In a bench trial in the District Court for the Central District of California, Mayzel was convicted of knowingly making a false statement, in violation of 18 U.S.C. § 1001. On September 20, 2000, Mayzel was sentenced to 205 days' imprisonment and ordered to pay a special assessment of $100; no fine was ordered because the district court determined that Mayzel did not have the ability to pay. The district court acquitted Mayzel of attempting to transport unreported currency over $10,000 out of the United States, 31 U.S.C. § 5316, reasoning that to violate this statute a person must make a false report in writing.
 
 II. Procedural History
 
 6
 Meanwhile, on March 9, 2000, the United States Customs Service notified Mayzel of the seizure of the $100,348, informing him that if he wished to contest the proposed forfeiture of these funds, he would be required as a claimant to submit a petition in support of his claim and a cost bond. Mayzel did so on April 7, 2000, stating that he was a "lawful possessor" of the currency, but failing to identify its owner. The matter was then referred to the United States Attorney's Office, which filed a forfeiture complaint in the Central District of California on August 22, 2000, and gave notice of the action by sending certified letters to all parties known to have an interest in the defendant currency — i.e., Mayzel and Harounian — and by publishing three notices in the Los Angeles Daily Journal. In response to these notices, the government received only one claim — from Mayzel, via his attorney, Michael Galey, on September 20, 2000. During a mandatory pre-trial meeting on November 15, 2000, Galey told Assistant United States Attorney Janet Hudson that Mayzel had obtained the seized funds from several friends and relatives. He did not provide their names or addresses, however, even after Hudson told him that persons who illegally transport money for drug-related purposes often persuade innocent friends and relatives to perjure themselves by claiming the seized money as their own. A few weeks later, Galey submitted a mandatory preliminary list of witnesses and documentary evidence to be offered at trial, identifying Mayzel as the only potential witness and listing no documents.
 
 
 7
 After several postponements, each at the request of Mayzel's attorneys, the government deposed Mayzel on March 6, 2001. The day before Mayzel's deposition, his new attorney, Eric Honig, told the government by letter that the owner of the currency was Amiel (a.k.a. "Eric Levy"), and provided a copy of Amiel's business checking account statement. Thereafter, Mayzel asserted in his deposition that Amiel was the owner of the currency. Mayzel testified that his uncle had taken him to meet Amiel, a family friend from a small town in Israel, at a coffee shop in Bonita, California (near San Diego). According to Mayzel, Amiel asked Mayzel to deliver a package — a blue bag containing $100,000 in cash — to Amiel's sister in Israel. Mayzel further testified that he had opened the bag and seen the money, but had not asked any questions about its provenance; he had told Amiel that he did not wish to be responsible if anything happened to the money.
 
 
 8
 At his deposition, Mayzel was also questioned about his travel plans both before his arrest (from Israel to the United States and within the United States) and his aborted travel plans when he was detained (from the United States to London and thereafter). Much of his testimony was demonstrably at odds with the travel agency records that the government subpoenaed, including the fact that when Mayzel was detained in Los Angeles, supposedly on his way to deliver the funds to Amiel's sister in Israel, he did not possess any tickets or reservations for travel to Israel.
 
 
 9
 Thereafter, Amiel submitted a declaration stating that he was the owner of the seized funds, was a family friend of the Mayzels, and had obtained the defendant currency as follows:
 
 
 10
 I built a 99' store in San Diego in 1998. The building was lost in a fire, and I received money from the insurance company. I then purchased a second store from Yosi Parpara, to whom I paid a total of $80,000.00. I later sold the second store to my brother-in-law, who paid me approximately $90,000 in cash. I then asked Mr. Mayzel to bring the cash from the sale, plus $10,000 more, to my sister in Israel.
 
 
 11
 Because of the declaration's lack of specificity, e.g., names of businesses, names of persons, addresses, dates, etc., the government could verify very few of these assertions. The government next attempted to depose Amiel.
 
 
 12
 Mayzel moved for summary judgment claiming that: (1) the government lacked probable cause to seize the defendant currency; (2) a forfeiture of any of the currency would be an excessive fine in violation of the Eighth Amendment; and (3) he was an "innocent owner." Honig informed the government that he wished to wait until after the court decided the summary judgment motion before scheduling Amiel's deposition. On August 1, 2001, the district court, sua sponte, granted summary judgment in favor of the government on the issues of probable cause and the applicability of the "innocent owner" defense, but reopened discovery on the Eighth Amendment issue. United States v. $100,348.00 U.S. Currency, 157 F.Supp.2d 1110 (C.D.Cal.2001).
 
 
 13
 On August 8, 2001, Amiel filed an untimely claim and answer in the forfeiture action, but failed to move for leave to file or to submit a declaration explaining his untimeliness. On the government's motion, the district court struck Amiel's claim and answer on October 25, 2001, for failure to comply with the procedural and jurisdictional requirements of Supplemental Admiralty and Maritime Rule C(6) of the Federal Rules of Civil Procedure. The court declined to exercise its discretion to entertain the late claim, writing "[s]ince Amiel was aware of the seizure in early March 2000 and the prejudice to the Government would be great if Amiel's claim and answer were to stand, the Government's Motion is GRANTED."[3]
 
 
 14
 Meanwhile, the government and Amiel's counsel failed to schedule Amiel's deposition before the Eighth Amendment hearing occurred, due to scheduling difficulties on both sides. As a result, no new evidence was submitted at the hearing. The district court determined that forfeiture of the entire $100,348 would constitute an excessive fine under the Eighth Amendment, reducing the forfeited amount to $10,000. Mayzel, Amiel, and the government timely appealed.
 
 III. Standard of Proof
 
 15
 Mayzel first argues that the government should have borne the heightened initial burden of proof set forth in the Civil Asset Forfeiture Reform Act of 2000, § 2(a), Pub.L. No. 106 185, 114 Stat. 202, 205 (codified at 18 U.S.C. § 983(c)(1)) ("CAFRA") (raising government's initial evidentiary burden from showing probable cause for the forfeiture to demonstrating by a preponderance of the evidence that forfeiture is warranted). CAFRA was enacted on April 25, 2000, and provided that it would apply "to any forfeiture proceeding commenced on or after the date that is 120 days after the date of the enactment of this Act." Id. § 21, 114 Stat. at 225. Because this case was commenced within this 120-day period, CAFRA does not apply. United States v. $80,180.00 in U.S. Currency, 303 F.3d 1182, 1184 (9th Cir.2002) (CAFRA does not apply to any case pending at the time of the Act's effective date). Therefore, the district court applied the correct standard of proof.
 
 IV. Forfeitability
 
 16
 Mayzel next asserts that the district court erred in granting summary judgment against him on the issue of forfeitability because a genuine issue of material fact exists as to his lack of English proficiency, which he contends would show that he did not knowingly violate the currency reporting statute. We review de novo a district court's grant of partial summary judgment. Delta Sav. Bank v. United States, 265 F.3d 1017, 1021 (9th Cir. 2001), cert. denied, 534 U.S. 1082, 122 S.Ct. 816, 151 L.Ed.2d 700 (2002).
 
 
 17
 Mayzel's argument fails because it rests on a misapprehension of the knowledge requirement in the reporting statute, 31 U.S.C. §§ 5316-5317. We have held that "[t]he only knowledge requirement [in § 5316] is that the person know that he or she is transporting more than [the statutory amount of currency] out of the country." United States v. One Hundred Twenty-Two Thousand Forty-Three Dollars ($122,043.00) in United States Currency, 792 F.2d 1470, 1474 (9th Cir.1986) (footnote omitted).[4] Our reading of the "plain language of the statutory provisions... does not include knowledge of the reporting requirement as an element for forfeiture." Id.; accord United States v. Forty-Seven Thousand Nine Hundred Eighty Dollars ($47,980) in Canadian Currency, 804 F.2d 1085, 1090 (9th Cir. 1986), cert. denied, 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 878 (1987).
 
 
 18
 Mayzel does not contest that he knew he was transporting more than $10,000; his offer of proof as to his lack of English proficiency went only to the question whether he knew he was required to report it. Thus, Mayzel raised no genuine issue of material fact regarding the defendant currency's forfeitability and summary judgment was proper.
 
 V. Amiel's Untimely Claim
 
 19
 Nor did the district court abuse its discretion in striking Amiel's untimely claim. Reasoning that Amiel was aware of the forfeiture proceedings for several months before filing a claim, the district court ruled that permitting the untimely claim would be at odds with the purpose of the claim deadline. Civil in rem forfeitures are governed by the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. United States v. 2659 Roundhill Drive, 283 F.3d 1146, 1149 n. 2 (9th Cir. 2002). At the time, Supplemental Rule C(6) provided that "[t]he claimant of a property that is the subject of an action in rem shall file a claim within 10 days after process has been executed, or within such additional time as may be allowed by the court." Fed.R.Civ.P. Supp. Admiralty & Mar. Cases C(6) (2000).[5] We review a district court's decision whether to consider an untimely claim under Supplemental Admiralty and Maritime Rule C(6) for abuse of discretion. 2659 Roundhill Drive, 283 F.3d at 1153.
 
 
 20
 Amiel's claim was undeniably late. In in rem cases, seizure of the res and the subsequent publication or service of notice of the seizure constitutes service of process. See Republic Nat'l Bank of Miami v. United States, 506 U.S. 80, 85, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992). The seizure of the defendant currency occurred on August 22, 2000. The newspaper notices — the relevant notices with respect to Amiel, who was not known to the government at the time of the seizure — were published on September 22, September 29, and October 6, 2000. Thus, absent the court's leave, Amiel's claim should have been filed by October 16, 2000. He did not, however, file any claim until August 8, 2001, over nine months later.
 
 
 21
 Amiel argues that the district court could still have accepted his late claim, and in this he is correct. Supplemental Rule C(6) permits district courts to enlarge the time for filing a claim. Fed.R.Civ.P. Supp. Admiralty & Mar. Cases C(6) (claims outside the ten-day filing window may be filed "within such additional time as may be allowed by the court"). Although we have held that "nothing in the Rule imposes a time limit on the exercise of [the district court's] discretion," we have also held that "the court's discretion is not unbounded. It should only exercise its discretion to grant additional time where the goals underlying the time restriction and the verification requirement are not thwarted." United States v.1982 Yukon Delta Houseboat, 774 F.2d 1432, 1435-36 (9th Cir. 1985).
 
 
 22
 In United States v. $149,345 United States Currency, 747 F.2d 1278 (9th Cir. 1984), we identified certain factors that the district court should consider in ruling on an untimely Rule C(6) claim: (1) "when [the claimant] became aware of the currency's seizure," (2) whether "the United States Attorney may have encouraged the delay," and (3) "[the decedent's] illness and death during this period," which "may have caused the [estate's] delay in filing." $149,345, 747 F.2d at 1282. However, we have never exhaustively listed the factors that a district court should weigh when considering an untimely petition. Both the Fourth and Seventh Circuits have also adopted what appear to be nonexclusive lists of factors for deciding whether to grant leave to file an untimely claim; these lists are not dissimilar. The Fourth Circuit's factors are based on the traditional "excusable neglect" standard:
 
 
 23
 when the claimant became aware of the seizure, whether the claimant was properly served, whether the government would be prejudiced, whether the government encouraged the delay or misguided the claimant, whether the claimant informed the government and the court of his interest before the deadline, whether the claimant had expended resources preparing for trial, the claimant's good faith, the claimant's health problems, whether the government has complied with procedural rules, and whether the claimant was acting pro se.
 
 
 24
 United States v. Borromeo, 945 F.2d 750, 753 (4th Cir.1991). The Seventh Circuit relies on slightly different factors, perhaps more suited to analyzing situations in which the late claim is potentially fraudulent:
 
 
 25
 the time at which the claimant became aware of the seizure, whether the government encouraged the delay, the reasons proffered for the delay, whether the claimant has advised the court and the government of its interest in [the] defendant [property] before the claim deadline, whether the government would be prejudiced by allowing the late filing, the sufficiency of the [pleadings] in meeting the basic requirements of the verified claim, and whether the claimant timely petitioned for an enlargement of time.
 
 
 26
 United States v. $10,000.00 in United States Funds, 863 F.Supp. 812, 814 (S.D.Ill.1994) (citing United States v. U.S. Currency in the Amount of $103,387.27, 863 F.2d 555, 563 (7th Cir.1988)), aff'd, 52 F.3d 329 (7th Cir.1995).[6]
 
 
 27
 Several factors identified by the Fourth and Seventh Circuits, as well as our own precedent, provide guidance here. Amiel was aware of the forfeiture proceedings at least as far back as March 21, 2001, when he submitted his declaration in support of Mayzel's claim, but made no good faith effort to submit his own claim until August 8, 2001. The government did not encourage the delay in Amiel's filing; in fact, for over a year it sought diligently, but unsuccessfully, to discover the identity of the true owner of the defendant currency. It only learned of Amiel from Mayzel, the lawful possessor, the day before Mayzel's long-delayed deposition. Certainly, if Amiel was the true owner, Mayzel could have supplied the government with his name at a much earlier point. Amiel himself proffered no reasons whatsoever — neither before the district court nor here — to justify his nine-month delay in filing a claim. Neither Amiel nor Mayzel informed the district court or the government of Amiel's alleged interest during the ten-day claim-filing window. And at no time did Amiel file a motion for an enlargement of time within which to file his claim.
 
 
 28
 Moreover, Amiel's claim was insufficient for lack of proper verification by his attorney. See Fed.R.Civ.P. Supp. Admiralty & Mar. Cases C(6) ("The claim shall be verified on oath or solemn affirmation.... If the claim is made on behalf of the person entitled to possession by an ... attorney, it shall state that the ... attorney is duly authorized to make the claim."). Compliance with this requirement is governed by local rule in the Central District of California, which lists strict and specific requirements for claim verification by a party's attorney. C.D. Cal. Admiralty & Mar. Claims R. E(2) ("[V]erification of a complaint may be made by an ... attorney ... who shall state the sources of the knowledge, information and belief contained in the complaint; declare that the document verified is true ...; state why verification is not made by the party ...; and state that the affiant is authorized so to verify."). Counsel's simple statement that she "has been authorized by said claimants [sic] to file this claim," is plainly deficient. This omission is not insignificant. We have recognized that "[t]he danger of false claims in these proceedings is substantial," requiring courts to "demand[] more than conclusory or hearsay allegations of some `interest' in the forfeited property." Baker v. United States, 722 F.2d 517, 519 (9th Cir.1983).[7]
 
 
 29
 Finally, accepting Amiel's late claim would have prejudiced the government. The government had litigated the case for nearly one year before Amiel attempted to file his claim, and several issues had already been definitively resolved by the district court, such as the forfeitability of the currency and the applicability of the "innocent owner" defense. Permitting the late claim would have resulted in costly duplicative litigation for the government, requiring it to litigate the same issues all over again.
 
 
 30
 FISHER, Circuit Judge, with whom D.W. NELSON, Circuit Judge, joins:
 
 VI. Excessive Fine
 
 31
 The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Forfeitures are "fines" within the meaning of the Eighth Amendment if they "constitute punishment for an offense." United States v. Bajakajian, 524 U.S. 321, 328, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). This is true even if the forfeiture is only "punitive in part." Id. at 329 n. 4, 118 S.Ct. 2028. Because a civil forfeiture under 31 U.S.C. § 5317 (2003) is "not limited by the extent of the government's loss" and "is tied to the commission of a crime," it is punitive in part and can be challenged as an excessive fine. United States v. $273,969.04 U.S. Currency, 164 F.3d 462, 466 (9th Cir.1999).
 
 A. Standing
 
 32
 Owners have standing to challenge forfeitures of their property, see United States v. $122,043.00 in U.S. Currency, 792 F.2d 1470, 1473 (9th Cir.1986), and can raise Eighth Amendment challenges to such forfeitures. See, e.g., United States v. 6380 Little Canyon Rd., 59 F.3d 974, 986 (9th Cir.1995). In addition, claimants who assert possessory interests in the forfeited property and provide some explanation for their possession have Article III standing to contest the forfeiture. See United States v. $191,910.00 in U.S. Currency, 16 F.3d 1051, 1057 (9th Cir. 1994) ("In order to contest a forfeiture, a claimant need only have some type of property interest in the forfeited items. This interest need not be an ownership interest; it can be any type of interest, including a possessory interest."). The novel question we face today is whether a claimant who asserts only a possessory interest in forfeited property has first-party standing to challenge the forfeiture under the Excessive Fines Clause of the Eighth Amendment. We conclude that a gratuitous bailee like Mayzel has a sufficient property interest in the seized property such that he would be "punished" by the forfeiture and can therefore bring a challenge in his own right under the Excessive Fines Clause.
 
 
 33
 In a forfeiture action, we look to state law to determine the "existence and extent" of a claimant's property interest. United States v.1980 Lear Jet, Model 35A, Serial No. 277, 38 F.3d 398, 402 (9th Cir. 1994). Under California law, a bailment is the deposit of personal property with another, usually for a special purpose. See Windeler v. Scheers Jewelers, 8 Cal.App.3d 844, 88 Cal.Rptr. 39, 43 (1970). A bailment that arises as a personal favor is a gratuitous bailment. See Cal. Civ.Code § 1844 (1985) ("Gratuitous deposit is a deposit for which the depositary receives no consideration beyond the mere possession of the thing deposited."); see also Todd v. Dow, 19 Cal.App.4th 253, 23 Cal.Rptr.2d 490, 494-95 (1993) (concluding that the storage of a rifle as a personal favor was a gratuitous bailment). A gratuitous bailee is a lawful possessor, though of a more particular kind. Cf. United States v. $38,000.00 in U.S. Currency, 816 F.2d 1538, 1544 (11th Cir.1987) ("As a bailee, [a claimant] has a possessory interest in the bailed currency, and consequently may assert a claim to the currency against anyone, other than the bailor, who interferes with that interest.") (citations omitted).
 
 
 34
 On facts similar to those here, we acknowledged the creation of a bailor-gratuitous bailee relationship in United States v. Alcaraz-Garcia, 79 F.3d 769, 774-75 (9th Cir.1996), albeit in the context of addressing the legal status of the owners of the seized money. The owners of $26,500 learned that Alcaraz planned to travel to Mexico to visit his family and friends. They asked Alcaraz "to deliver various sums from their savings to their respective families in Colima." Id. at 772. There was no indication that the owners had any close relationship with Alcaraz, that they paid him anything for his services or that he benefitted in any way from agreeing to deliver the funds. In those circumstances, we recognized that Alcaraz was a gratuitous bailee of the funds. Id. at 774-75. Here, Mayzel became a gratuitous bailee of Amiel's $100,000 when he accepted the funds to deliver to Amiel's sister in Israel, just as Alcaraz did when he accepted the funds to deliver to Colima.
 
 
 35
 As a gratuitous bailee, Mayzel has rights and obligations with respect to the entrusted funds. A gratuitous bailee must deliver the property to the owner on demand. See Todd, 23 Cal.Rptr.2d at 494. If he misdelivers the property to the wrong person, even by accident, he is liable to the owner for conversion. See Byer v. Canadian Bank of Commerce, 8 Cal.2d 297, 65 P.2d 67, 68 (1937) (holding a gratuitous bailee liable for the bonds entrusted to it when the bailee delivered the bonds to an impostor). Moreover, a gratuitous bailee owes a duty to exercise "slight care" over the property. Todd, 23 Cal.Rptr.2d at 494. Consequently, he is liable for loss or damage to the property if he is grossly negligent in handling it. See Roselip v. Raisch, 73 Cal.App.2d 125, 166 P.2d 340, 344 (1946). Mayzel, by virtue of his attendant obligations as a gratuitous bailee of Amiel's $100,000, would be "punished" by a forfeiture of the entire $100,348. Accordingly, we hold that Mayzel has standing in his own right to raise an Eighth Amendment challenge to the full forfeiture amount.
 
 
 36
 Nevertheless, the responsibilities of a gratuitous bailee can be modified by contract. See Kaye v. M'Divani, 6 Cal.App.2d 132, 44 P.2d 371, 373 (1935); 9 Cal. Jur.3d Bailments § 39 (2003) ("Subject to considerations of public policy, the liability of the bailee under a contract of bailment for loss or damage may be increased or diminished by stipulation...."). Here, when Mayzel took possession of the money, he told Amiel, "[S]hould anything ever happen to[the $100,000], that perhaps I wouldn't be responsible for it." Even assuming that Mayzel meant to condition his responsibilities — notwithstanding the "perhaps" qualifier — there is no evidence that Amiel ever assented to this condition, orally or otherwise. Even if Amiel had assented, it is doubtful either Amiel or Mayzel understood that this statement freed Mayzel from his legal duties to exercise at least slight care in delivering the money to its intended recipient. More likely, the statement was intended to clarify that Mayzel would not be responsible for loss or damage which he did not cause — for example, if Mayzel were mugged on the way to the airport. This interpretation of Mayzel's statement is reinforced by the context of Mayzel's testimony. During Mayzel's deposition, he was asked, "Were you worried about the money being stolen from you?" Mayzel replied, "I told [Amiel] that, should anything ever happen to [the $100,000], that perhaps I wouldn't be responsible for it." By contrast, had Mayzel decided to spend the $100,000 for himself, he could hardly claim that the condition relieved him of liability to Amiel. Therefore, we cannot construe Mayzel's ambiguous statement as having modified his duties as a gratuitous bailee in any way material here.
 
 
 37
 We acknowledge the implications of allowing claimants other than the owners of currency to assert Eighth Amendment challenges to civil forfeitures. For example, owners engaging in criminal activities might hide in the shadows and allow their "mules" or couriers to press excessive fines challenges for the owners' benefit. Yet notwithstanding the problems law enforcement might encounter as a result of broadening Eighth Amendment standing, Congress enacted the "claimant friendly" Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), granting any "claimant" the right to "petition the court to determine whether [a] forfeiture [is] constitutionally excessive." 18 U.S.C. § 983 (2003). Although Mayzel's claim is not governed by CAFRA, that Congress has opted to give claimants like him statutory standing to litigate an excessive fines claim weighs against our carving out a prudential barrier to standing in this case — especially one that will have a dramatically short shelf-life due to CAFRA.
 
 
 38
 We therefore conclude that Mayzel has a sufficient property interest in the full $100,348 such that he can in his own right — as a party "punished" by the forfeiture — challenge the entire amount of the forfeiture under the Excessive Fines Clause. The district court properly granted him such standing.
 
 B. Excessiveness of Fine
 
 39
 Because Mayzel has standing to bring an Excessive Fines challenge, the next question is whether the $10,000 forfeiture authorized by the district court is excessive. We review the district court's determination of excessiveness de novo. Bajakajian, 524 U.S. at 336 n. 10, 118 S.Ct. 2028. However, we must accept the district court's findings of fact in conducting the excessiveness inquiry unless they are clearly erroneous. Id.
 
 
 40
 A punitive forfeiture is excessive if it "is grossly disproportional to the gravity of a defendant's offense." Id. at 334, 118 S.Ct. 2028. In this case, the relevant offense is Mayzel's failure to report the $100,348 in violation of 31 U.S.C. § 5316.[8] See 31 U.S.C. § 5317(c). When examining the proportionality of a forfeiture to the gravity of the offense, we are not required to consider "any rigid set of factors." United States v. Mackby, 339 F.3d 1013, 1017 (9th Cir.2003). Nevertheless, this court has often looked to "factors similar to those used by the Court in Bajakajian." Id. In Bajakajian, the Supreme Court considered four factors in weighing the gravity of the defendant's offense: (1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused. See Bajakajian, 524 U.S. at 337-40, 118 S.Ct. 2028.
 
 
 41
 In light of these factors, we conclude that a forfeiture of $100,348 would be excessive but that $10,000 would not be. First, Mayzel's crime was "solely a reporting offense." Id. at 337, 118 S.Ct. 2028. The money would have been lawful for Mayzel to take out of the country "so long as he reported it." Id.
 
 
 42
 With respect to the second factor, the district court found that "there is credible evidence that the money comes from a lawful source." Even though Mayzel's itinerary was unusual and luggage found in his possession contained items often used in packaging drugs,[9] Mayzel was never charged with any criminal activity other than failing to report the currency and making false statements. See United States v. 3814 NW Thurman St., 164 F.3d 1191, 1197 (9th Cir.1999) (weighing the fact that the claimant had "not been charged with any related criminal activity" in determining whether a forfeiture was excessive). Moreover, Amiel submitted a sworn declaration that the money was obtained from the sale of his store to his brother-in-law, and the government did not refute this evidence. Therefore, based on the record as a whole, we cannot say that the district court's finding was clearly erroneous.
 
 
 43
 Regarding the third factor, we look to "other penalties that the Legislature has authorized" and the "maximum penalties that could have been imposed under the Sentencing Guidelines" as measures of the gravity of the offense. Id. (internal quotation marks omitted). Congress has authorized imprisonment of up to five years and a fine of up to $250,000 for a violation of 31 U.S.C. § 3516. See 31 U.S.C. § 5322. However, the maximum penalties under the Sentencing Guidelines should be given greater weight than the statutory maximum because the Guidelines take into account the specific culpability of the offender. See 3814 NW Thurman St., 164 F.3d at 1197.
 
 
 44
 Under the Sentencing Guidelines, the maximum fine in Mayzel's case could have been either $5,000 or $30,000. Mayzel's base offense level for violating § 5316 would have been 12 (6 levels for failure to file a currency report and a 6-level increase for the $100,348 value of the currency). See United States Sentencing Guidelines § 2S1.3(a) (2000). However, his offense level would have been reduced to 6 if four conditions were met: (1) Mayzel did not know or believe that the funds were proceeds of unlawful activity; (2) Mayzel did not act with reckless disregard as to the source of the funds; (3) the funds were the proceeds of lawful activity; and (4) the funds were to be used for a lawful purpose. See id. § 2S1.3(b)(2). A $30,000 maximum fine can be imposed for an offense level of 12, and a $5,000 maximum fine can be imposed for an offense level of 6. Id. § 5E1.2.
 
 
 45
 Although the district court found that the funds were the proceeds of lawful activity, it did not make explicit factual findings on the other three conditions. The district court merely noted that in Bajakajian "$5,000 was the maximum fine under the Sentencing Guidelines for violating § 5316." However, $5,000 is not the maximum fine under the Sentencing Guidelines for all violations of § 5316. The determination of the maximum fine must be made on a case-by-case basis. "The culpability of the offender should be examined specifically, rather than examining the gravity of the crime in the abstract." 3814 NW Thurman St., 164 F.3d at 1197.
 
 
 46
 In this case, there is evidence that Mayzel acted with reckless disregard as to the source of the funds. For instance, the following colloquy took place during Mayzel's deposition:
 
 
 47
 Q: Did [Amiel] explain why he was sending[the $100,000] to his sister?
 
 
 48
 A: No. He didn't tell me. I didn't even ask.
 
 
 49
 * * *
 
 
 50
 Q: Did you ask him why he was sending cash instead of travelers' checks or bank checks?
 
 
 51
 A: No.
 
 
 52
 * * *
 
 
 53
 Q: Did [Amiel] tell you anything about where he got that money?
 
 
 54
 A: No. I didn't ask.
 
 
 55
 Although this evidence may not be enough to support a finding of reckless disregard for purposes of sentencing under the Guidelines, it shows more than a minimal level of culpability for purposes of assessing the gravity of Mayzel's offense under the Excessive Fines Clause.[10]
 
 
 56
 The fourth factor is the extent of the harm caused by the offense. The district court found, "There is no evidence that the government suffered a loss." Thus, the only harm was the deprivation of information that $100,348 left the country. Although this information has some value to the government because it may facilitate investigation of other crimes, the harm is "minimal." Bajakajian, 524 U.S. at 339, 118 S.Ct. 2028. In sum, applying the Bajakajian factors to this case leads to the conclusion that Mayzel's offense was in the low range of the gravity spectrum.
 
 
 57
 Finally, comparing the amount of forfeiture to the gravity of Mayzel's offense demonstrates that $100,348 would be grossly disproportional to the gravity of the offense. Mayzel's failure to report the currency and false statements were not connected with other illegal activity, and the violations caused negligible harm. Moreover, a forfeiture of $100,348 is many times more than either the $5,000 or $30,000 maximum fine under the Sentencing Guidelines.
 
 
 58
 However, a forfeiture of $10,000 is not grossly disproportional to the gravity of Mayzel's offense. A $5,000 forfeiture would not necessarily reflect Mayzel's level of culpability given his failure to inquire about the source of the unreported currency. Nevertheless, his ignorance alone does not compel a $30,000 forfeiture. The $10,000 forfeiture is closer to $5,000 and strikes an appropriate balance between the $5,000 and $30,000 options. Considering all the circumstances, we conclude that the forfeiture amount the district court selected is not constitutionally excessive.
 
 
 59
 WARDLAW, Circuit Judge, with whom D.W. NELSON, J., and FISHER, J., Circuit Judges, join:
 
 VII. Attorney's Fees
 
 60
 The Equal Access to Justice Act provides: "a court shall award to a prevailing party ... fees and other expenses... incurred by that party in any civil action ... brought by or against the United States ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). Although the majority's analysis of Eighth Amendment standing renders Mayzel a "prevailing party," the district court did not abuse its discretion in holding that the government's litigation position was "substantially justified." A substantially justified position "must have a reasonable basis both in law and in fact." 2659 Roundhill Drive, 283 F.3d at 1151 (internal quotation marks omitted). The government must have been substantially justified in taking its original action and in defending the validity of the action in court. Id. Mayzel concedes that the government was "substantially justified in its initial seizure of the currency ... and in filing the complaint." In the end, the government also prevailed on every issue except the question of Mayzel's Eighth Amendment standing. This issue presented a novel and close question of law, as to which reasonable jurists disagreed. We therefore conclude the government's position had a "reasonable basis both in law and in fact." Id.
 
 VIII. Conclusion
 
 61
 For the foregoing reasons, we AFFIRM the district court's forfeiture order.
 
 
 62
 AFFIRMED.
 
 WARDLAW, Circuit Judge, dissenting in part:
 
 63
 I respectfully dissent from Part VI of the majority opinion holding that Mayzel has standing to assert a challenge to the amount ordered forfeited based on the Eighth Amendment's Excessive Fines Clause. Based on the text, history, and purpose of the Eighth Amendment, I would conclude that the district court erred in permitting Mayzel to assert such a claim.
 
 
 64
 The Eighth Amendment forbids the "impos[ition]" of "excessive fines" alongside its more familiar bans on "[e]xcessive bail" and "cruel and unusual punishments." U.S. Const. amend. VIII. This amendment, and the Excessive Fines Clause in particular, was the subject of very little debate among the Framers, and thus little is known about its original meaning. See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 264-65, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). The Supreme Court has recently held that it applies to some types of civil forfeiture as well as to the imposition of criminal fines. See Austin v. United States, 509 U.S. 602, 609-10, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). The touchstone for whether civil forfeitures are treated as fines for the purposes of the Excessive Fines Clause is the extent to which the forfeitures are "punitive." Id. at 610, 113 S.Ct. 2801.
 
 
 65
 The Court's current test for excessiveness of a civil fine was announced in United States v. Bajakajian, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). Once it is determined that a civil forfeiture is at least in part "punitive," a court must invalidate it if it is "grossly disproportional to the gravity of [the] defendant's offense." Id. at 334, 118 S.Ct. 2028. Previously, we had a different test for excessiveness, focusing on the "culpability of the owner" of the forfeited property, even when that person was not the "defendant." United States v. 6380 Little Canyon Rd., 59 F.3d 974, 986 (9th Cir.1995). We justified our earlier standard on the basis that "[t]he owner's culpability is relevant because it is the owner who is punished by the forfeiture." Id. (citing Austin, 509 U.S. at 618-19, 113 S.Ct. 2801) (emphasis in original).
 
 
 66
 Mayzel argues that the switch from relying on the "owner['s]" culpability to relying on that of the "defendant[]" (who is more likely to be the claimant) signals the Court's disagreement with the general principle that it is the owner of the property who is punished by forfeiture. Thus, he suggests that the Court has implicitly granted all possessors of seized property standing to assert an Excessive Fines challenge to the amount of forfeiture. This is an erroneous interpretation of Bajakajian. Bajakajian stands for the simple proposition that for purposes of the "gross proportionality" analysis, the relevant comparison is between the value of the property seized and the conduct of the person from whom it is seized. This is consonant with the theoretical underpinning of civil in rem forfeiture, according to which the forfeited property itself is the subject of proceedings for its involvement in illegal activities committed by the person it is seized from, not necessarily its owner. See generally Bajakajian, 524 U.S. at 330, 118 S.Ct. 2028. That the defendant's conduct is one of the factors in the proportionality analysis has no bearing on the question we face here, i.e., determining who is "punished" by civil forfeiture for Eighth Amendment purposes.
 
 
 67
 The Bajakajian opinion recognized that owners of seized property and the criminal defendants from whom the property is seized are frequently not the same persons, id. at 328 n. 3, 118 S.Ct. 2028 (explaining that when the government seizes funds from a "cash courier" it will ordinarily "investigate the source and true ownership of [the] unreported funds," i.e., the "kingpin[]," in an attempt to prosecute that person as well), and even cited the fact that "innocent owners" of seized property normally have a defense to civil forfeiture. Id. at 328, 118 S.Ct. 2028. Indeed, the very notion of an "innocent owner" defense is only consistent with the principle that it is the owner who is punished by an unconstitutionally excessive fine. Thus, there is no reason to depart from our previous determination that it is the owner of seized property — not necessarily the person from whom the property is seized — who is "punished" by its forfeiture for Eighth Amendment purposes.
 
 
 68
 This conclusion is unremarkable. The Bill of Rights guarantees numerous personal rights to individuals. L.A. Police Dep't v. United Reporting Publ'g Corp., 528 U.S. 32, 39, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999) ("[A] cardinal principle[] of our constitutional order [is] the personal nature of constitutional rights...." (emphasis added)); Whitmore v. Arkansas, 495 U.S. 149, 160, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (only a person himself subject to the death penalty has standing to assert an Eighth Amendment objection under the Cruel and Unusual Punishment Clause to its imposition); Alderman v. United States, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."). The constitutional doctrine of standing guarantees that only those people whose rights are violated may sue for their restoration. See Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 221, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) ("[Standing] requir[es] that the complaining party ... suffer[] a particular injury caused by the action challenged as unlawful.").
 
 
 69
 It is possible, however, that in certain cases a person who is not the owner of seized property may nevertheless suffer on account of its forfeiture in a manner sufficient to implicate Eighth Amendment concerns. Such a situation might arise, for example, when the possessor owes a substantial legal or contractual duty to the owner, or even perhaps where there is an immediate familial relationship between the owner and the possessor. There are two different theoretical rubrics that we could use to analyze such a situation: We could deem that, in addition to the owner, a possessor of seized property is somehow also always "punished" for Excessive Fines purposes by a proposed forfeiture, and thus always entitled to make a constitutional challenge to the amount forfeited; or we could use the existing doctrine of "third-party standing" to evaluate whether the possessor had a sufficient stake in the seized property so as to permit him to assert an Excessive Fines claim on behalf of the owner.
 
 
 70
 Which of the two approaches is appropriate is a matter of first impression. Preliminarily, we must consider two cases cited by Mayzel which, he asserts, have already addressed this issue, and resolved it in favor of his position. First, he cites one of our cases involving a currency seizure in which the claimants were two brothers: one brother had allegedly wired the currency to the other, and the latter had been arrested and convicted for failing to report the currency before leaving the United States for the United Arab Emirates. See United States v. $69,292.00 in U.S. Currency, 62 F.3d 1161, 1163-64 (9th Cir. 1995). We remanded the case to the district court for a determination of the actual ownership of the currency, which was in dispute, and thereafter for an Excessive Fines determination if necessary. Id. at 1168. Mayzel asserts that the fact that our opinion did not specify in its conclusory remarks whether only the brother who is determined to be the owner will be able to assert an Excessive Fines defense implicitly condones either brother's assertion of such a defense. This contention is without merit. That we ordered the determination of ownership to occur before any hearing of an Excessive Fines defense, if anything, supports the opposite view: that only when the true owner is determined will the district court be in a position to entertain a constitutional challenge to the proposed forfeiture from the correct party.
 
 
 71
 The other case cited by Amiel is an unpublished district court order from the Eastern District of New York. See United States v. U.S. Currency in the Sum of Ninety Seven Thousand Two Hundred Fifty-Three Dollars ($97,253.00), More or Less, No. 95-CV-3982 (JG), 1999 WL 458155 (E.D.N.Y. June 30, 1999). That case examined whether a bailee of seized currency had standing to contest its forfeiture on Eighth Amendment grounds; the court there determined that the bailee had standing under Article III and that he had complied with the jurisdictional procedural requirements of Supplemental Rule C(6) — what the district court termed "statutory standing." Id. at *4-*8. The district court did not, however, make any inquiry or pronouncement regarding the propriety of the bailee's assertion of the owner's constitutional claims (although if it had, it might have found the bailor-bailee relationship sufficient to establish third-party standing).
 
 
 72
 The cited cases fail to support Mayzel's view, and in any event, the better approach is to rely on traditional principles of standing rather than to create a blanket rule granting standing to assert Eighth Amendment rights to any and all possessors, who could range from a person who found the seized property on the street, to a thief, to an unwitting traveler into whose bag the seized property was surreptitiously placed.[1] Rather, it appropriately requires a careful case-by-case analysis of the relationship between the owner and the possessor to determine whether the possessor in a particular case should be entitled to assert any Eighth Amendment interest in the property.[2]
 
 
 73
 The correct approach would require us to evaluate Mayzel's claim that the proposed forfeiture is unconstitutionally excessive. The general rule of third-party standing, or jus tertii, forbids one party from asserting the injuries of another. See Powers v. Ohio, 499 U.S. 400, 410-11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Courts have recognized an exception to this rule when "three important criteria are satisfied": (1) "the litigant must have suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the dispute"; (2) "the litigant must have a close relationship to the third party"; and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." Id. (citing Singleton v. Wulff, 428 U.S. 106, 112-16, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)). These requirements are designed to ensure that a court's decision regarding a right asserted by a third party will not be unnecessary "`in the sense that the right's enjoyment will be unaffected by the outcome of the suit.'" Voigt v. Savell, 70 F.3d 1552, 1564 (9th Cir.1995) (quoting Singleton, 428 U.S. at 115, 96 S.Ct. 2868). A third party may litigate another person's rights only if "the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." Sec'y of State v. Joseph H. Munson Co., 467 U.S. 947, 956, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984).
 
 
 74
 Here, regardless whether Mayzel can claim that he has suffered some cognizable injury, he has failed to demonstrate that he satisfies the latter two Powers requirements. Although the courts have provided no clear definition of what constitutes a constitutionally requisite close relationship, when it is met "`the relationship between the litigant and the third party [is] such that the former is fully, or very nearly, as effective a proponent of the right as the latter.'" Voigt, 70 F.3d at 1564-65 (quoting Singleton, 428 U.S. at 115, 96 S.Ct. 2868). This requirement is not formidable. See, e.g., Craig v. Boren, 429 U.S. 190, 194, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (permitting a liquor-store operator to assert the Equal Protection rights of her underage male patrons); see also 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.9 nn. 63-69 (2d ed. 1984 & Supp.2003) (listing constitutionally adequate close relationships as including vendor-client, physician-patient, attorney-client, employee — employer, electoral candidate — voter, school board — student).
 
 
 75
 Although the parties neither raised this point below nor on appeal,[3] the majority engages in a California state-law analysis to determine the legal nature of Mayzel's and Amiel's relationship. See United States v.1980 Lear Jet, 38 F.3d 398, 402 (9th Cir.1994) ("[S]tate law governs the existence and extent of [a person's] property interest...."). It concludes that Mayzel was a "gratuitous bailee" of Amiel's, see Cal. Civ.Code § 1844; Todd v. Dow, 19 Cal.App.4th 253, 23 Cal.Rptr.2d 490 (1993), and that such a relationship is sufficient to confer first-party standing. I would not even conclude that the relationship here is sufficiently close to satisfy that prong of the third-party standing inquiry. That is the beginning, however, not the end of the relevant inquiry. Although state law defines the legal relationship between the parties, and their respective rights and duties, the question whether that state relationship vests the claimant with sufficient interest to bring a federal constitutional claim in federal court is one governed by federal law.[4] See United States v. Portillo, 633 F.2d 1313, 1316-17 (9th Cir.1980).
 
 
 76
 A gratuitous bailment under California law is barely a legal relationship at all. The gratuitous bailee has a duty to use "slight care" over the bailed items, and has a duty to return the bailed item to the bailor on demand. See Todd, 23 Cal. Rptr.2d at 494. The bailor retains all legal rights, including full title, to the bailed items unless and until the bailee turns the bailed items over to the intended recipient, at which point the gift delivery is completed and title vests in the recipient. See Alcaraz-Garcia, 79 F.3d at 775. Furthermore, as the majority acknowledges, the responsibilities of a gratuitous bailee, like those of members of any other legal relationship, can be modified by contract, see Kaye v. M'Divani, 6 Cal.App.2d 132, 44 P.2d 371, 373 (1935), such as the claimed oral agreement between Mayzel and Amiel in this case: "should anything ever happen to [the $100,000], that perhaps [Mayzel] wouldn't be responsible for it."
 
 
 77
 Thus, without deciding generally whether a gratuitous bailee could ever have a sufficiently close relationship with the bailor to satisfy the "close relationship" standard, or could ever be sufficient to confer first-party standing, the fact of the matter is that such a relationship does not exist here. Mayzel and Amiel hardly knew each other, other than through a vague family connection, and had never spoken to one another before the date Amiel gave Mayzel the money. Moreover, Mayzel states that he was not compensated in any way for his courier services, and that he specifically assumed no liability for the money if anything happened to it. If the "close relationship" requirement is to mean anything at all, it cannot be satisfied by this ersatz association.
 
 
 78
 Turning to the third prong of the jus tertii inquiry, there is no hindrance to Amiel's assertion of his own Eighth Amendment rights (to the extent that he actually is the owner of the currency, a matter regarding which I express no opinion). Any hindrance that he could assert, viz. his inability to participate in the instant lawsuit, is entirely of his own making. While hindrances capable of satisfying this requirement need not be imposed entirely by the state, Powers, 499 U.S. at 414-15, 111 S.Ct. 1364, they cannot be entirely self-imposed either. Cf. Miller v. Albright, 523 U.S. 420, 448, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (O'Connor, J., joined by Kennedy, J., concurring in the judgment) (finding no third-party standing because "any hindrance to the vindication of [the first party's] constitutional rights[was] ultimately self imposed"); id. at 474, 118 S.Ct. 1428 (Breyer, J., joined by Souter and Ginsburg, JJ., dissenting) (disagreeing with the concurrence on the grounds that "[t]he conclusion that the Government `hindered' [the first party's] assertion of his own rights ... is irresistible" (emphasis added)).
 
 
 79
 There is no reason Amiel could not have participated in this suit other than his failure to file a timely claim and to offer the district court any reason whatsoever to accept his untimely one. He was put on proper notice of the seizure, and failed at any point to make a valid claim for the funds' return. He never petitioned the district court to accept his procedurally deficient and untimely claim, and never attempted to supplement the record with any facts or documents substantiating his questionable proprietary interest in the seized funds. He never verified his claim despite the existence of a clear local rule (and accompanying form) available for that purpose. In sum, he displayed a complete lack of diligence in pursuing his claim, which is why the district court rejected it. Furthermore, the government never took any action to hinder or preclude his ability to file a proper claim. A simple disregard for rules and procedures cannot constitute a "hindrance" sufficient to vest a third party with standing to pursue one's claims on one's behalf.
 
 
 80
 I would therefore hold that Mayzel does not have standing to assert the Eighth Amendment rights of the owner of $100,000 of the seized currency. Nor does California state law confer a sufficient interest in him as a gratuitous bailee to confer standing in his own right. To the extent that Mayzel is himself the owner of the remaining $348, a fact he has not yet proved up, he does have standing to contest the constitutionality of that forfeiture.
 
 
 81
 It is important to explain what I would not hold. I would not hold that Mayzel lacks standing to bring the instant suit; it is clear that he does. See United States v. $191,910.00 in U.S. Currency, 16 F.3d 1051, 1057 (9th Cir.1994) ("In order to contest a forfeiture, a claimant need only have some type of property interest in the forfeited items. This interest need not be an ownership interest; it can be any type of interest, including a possessory interest."). Rather, I would hold that to have standing to challenge the constitutionality of the amount of forfeiture under the Excessive Fines Clause, a claimant must be the person who is "punished" by the forfeiture, or a third party who is entitled to assert that person's rights in forfeiture litigation.
 
 
 82
 Mayzel suffered an injury in fact when the currency was seized from him at the airport. The mere fact that he suffered some cognizable injury does not mean that the proposed forfeiture "punishes" him for Eighth Amendment purposes, or that he is entitled to assert the constitutional rights of any person who may have been so punished. (Indeed, the district court correctly held that Mayzel was not entitled to assert an "innocent owner" defense to the forfeiture, because he was not the defendant currency's owner.) Rather, it permits him only to challenge the legality of the seizure itself and make any related claims. See, e.g., Nat'l Comm. of the Reform Party of the United States v. Democratic Nat'l Comm., 168 F.3d 360 (9th Cir.1999) (dismissing some claims for lack of standing but deciding others on the merits); cf. Bowen v. First Family Fin. Servs., Inc., 233 F.3d 1331, 1339 (11th Cir.2000) (quoting 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531, at 568 (2d ed. Supp.2000)) ("`A party with standing to advance one claim may lack standing to advance other claims....'").
 
 
 83
 The result of the majority's excursion into a supposed relationship under state law is to award Mayzel a $90,000[5] wind-fall. Therefore, I dissent.
 
 
 
 Notes:
 
 
 [1]
 The parties vigorously dispute the extent of Mayzel's English proficiency. We need not resolve this issue, however, because it is immaterial to his appeal. We simply observe that all of the conversations described above occurred in English, without the assistance of an interpreter
 
 
 [2]
 The luggage was checked in the name of Mayzel's traveling companion, Iman Harounian, but the claim tickets were stapled to Mayzel's ticket. Harounian suddenly left the airport upon observing Mayzel speaking with the Customs agents. He never boarded the flight to London
 
 
 [3]
 In its three-page order discussing the factors relevant to determining whether Amiel's late claim should be accepted, the district court made no mention of Mayzel's abilityvel non to assert an Eighth Amendment challenge.
 
 
 [4]
 In contrast, we have held that in acriminal prosecution for the violation of § 5316, the government must show knowledge of the reporting requirement. United States v. Alzate-Restreppo, 890 F.2d 1061, 1064-65 (9th Cir. 1989).
 
 
 [5]
 Supplemental Rule C(6) was later amended, effective December 1, 2002, to allow claimants 30 days to file their claims
 
 
 [6]
 None of the factors set forth in any of these cases includes whether another claimant has a viable claim
 
 
 [7]
 While Mayzel's claim was not properly verified either, this error is not fatal to his claim, because his right to file a claim was not disputedSee 1982 Yukon Delta Houseboat, 774 F.2d at 1436 (observing that "the absence of a verification was [made] ... less significant because at no time during the entire proceeding did any party to the dispute doubt" the relevant claimant's right to file a legitimate claim for the defendant property).
 
 
 [8]
 Even though Mayzel was also charged with making a false statement to a federal officer in violation of 18 U.S.C. § 1001, the civil forfeiture under 31 U.S.C. § 5317 in this case is not tied to a violation of 18 U.S.C. § 1001Cf. Bajakajian, 524 U.S. at 337 n. 12, 118 S.Ct. 2028 ("The Government indicted respondent under 18 U.S.C. § 1001 for `lying,' but that separate count did not form the basis of the nonreporting offense for which § 982(a)(1) orders forfeiture.").
 
 
 [9]
 The luggage was not checked to him but another passenger. However, Mayzel had the baggage claim tickets for the luggage
 
 
 [10]
 Mayzel argues that he is not culpable because he was acquitted of the § 5316 charge in the criminal case and the district court imposed no fine on him for violating 18 U.S.C. § 1001. But neither fact is relevant to our determination here. First, Mayzel was acquitted of the § 5316 charge because the district court found that the government did not meet its burden of proving beyond a reasonable doubt that Mayzel knew of the reporting requirement. Knowledge of the reporting requirement is not an element of civil forfeiture under § 5317See $122,043.00, 792 F.2d at 1474. Second, the district court waived the fine for Mayzel's conviction under section 1001 because it found that the defendant did not have the ability to pay, which does not bear on Mayzel's culpability level.
 
 
 [1]
 While it is true, as the majority argues, that California law defines a "gratuitous bailment" relationship, under which bailees are vested with certain,de minimis obligations, see Cal. Civ.Code § 1844, it is not true that such a relationship automatically raises the stakes for such a bailee to the level of a property owner "punished" for Eighth Amendment purposes by a forfeiture. As discussed below, it remains necessary to conduct a third-party standing analysis to determine whether any non-owner has a sufficient stake in the seized property to be entitled to assert the owner's constitutional rights therein.
 
 
 [2]
 That Congress has recently weighed in on this issue is irrelevant to this case. Included in the claimant-friendly Civil Asset Forfeiture Reform Act of 2000 was a provision grantingany "claimant" the right to "petition the court to determine whether [a] forfeiture[is] constitutionally excessive." CAFRA § 2, 114 Stat. at 209-10 (enacting 18 U.S.C. § 983(g)). Of course, third-party standing is a prudential, judge-made doctrine, Craig v. Boren, 429 U.S. 190, 193, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), which Congress can eliminate by statute, see Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). Thus, in forfeiture proceedings governed by the provisions of CAFRA, any claimant, whether the owner of the seized property or not, is entitled to assert a challenge based on the Excessive Fines Clause. However, as explained in Part III supra, the instant suit is not governed by CAFRA because it was filed before the statute's effective date. Thus, contrary to Mayzel's suggestion, the amendments in CAFRA do not affect this case.
 
 
 [3]
 Ordinarily we would not reach this question because a party is deemed to have waived any argument it fails to raise before the district court or in its briefs on appealSee Idaho Watersheds Project v. Hahn, 307 F.3d 815, 830 (9th Cir.2002) (before district court); Mauro v. Arpaio, 188 F.3d 1054, 1059 n. 2 (9th Cir.1999) (en banc) (appellate briefs). Theories pertaining to California state law are addressed here only because the majority introduces them into this appeal.
 
 
 [4]
 The majority attempts to bootstrap the state law gratuitous bailee analysis into the question of whether federal law provides Eighth Amendment standing. However, the case it cites for this effort,Alcaraz-Garcia, holds exactly to the contrary. In Alcaraz-Garcia, the legal interest of the bailee was not analyzed at all. Alcaraz-Garcia, 79 F.3d at 774-76. Rather, the court analyzed whether the bailor retained a sufficient "legal right" in the bailed property. Id. Thus, Alcaraz-Garcia stands merely for the general well-accepted proposition that it is the owner of the property who is punished by forfeiture. The majority's reliance on Alcaraz-Garcia is thus misplaced.
 
 
 [5]
 I would have remanded to provide Mayzel the opportunity to prove that he "owned" the remaining $348 of the seized funds which he handed to Inspector Uscanga at the airport